**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No.

SOLO SCIENCES, INC.,

      Plaintiff

      v.

ASHESH SHAH and PALLE PEDERSEN.

      Defendants.

---

## COMPLAINT

---

Plaintiff Solo Sciences, Inc. ("Solo"), by its attorneys and for its Complaint against Ashesh Shah and Palle Pedersen ("Defendants"), allege and state as follows:

### NATURE OF THE ACTION

1.     Plaintiff brings this lawsuit to remedy the substantial harm caused by Defendant Shah and Defendant Pedersen's unlawful and economically damaging conduct in the operation and management of Solo.

### THE PARTIES, JURISDICTION, AND VENUE

2.     Plaintiff Solo Sciences, Inc. ("Solo") is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 1550 Larimer Street #246, Denver, Colorado, 80202.

3.     Defendant Ashesh Shah is a citizen of Massachusetts. He can be served with process at 12 Heath Hill, Brookline, Massachusetts 02445.

4.     Defendant Palle Pedersen is a citizen of Massachusetts. He can be served with process at 44 Cypress St., Brookline, Massachusetts 02445.

1

5.      This action arises under Delaware General Corporation Law and Colorado common law. The damages and harm that resulted from Defendants' actions were and are experienced by Plaintiff in the State of Colorado and the United States District Court for the District of Colorado.

6.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338, and 1367.

7.      This Court also has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship among the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

8.      This Court has personal jurisdiction over Defendant Shah and Defendant Pedersen because Defendant Shah and Defendant Pedersen took action in  Colorado.  In addition, their wrongful and fraudulent actions were aimed at Colorado and a company, Solo, who is headquartered in Colorado.  Furthermore, Defendant Shah operated Solo Sciences, Inc. in Colorado.  Defendants Shah and Pedersen both appeared in Colorado on at least four separate times to attend to Solo business in a four month period in 2019 through 2020. In addition, Defendants caused invoices to be issued in Colorado.  Accordingly, Defendants have established minimum contacts with the District of Colorado.

9.      Venue is proper in this district under 28 U.S.C. § 1391.

## BACKGROUND

10.      Solo was founded in 2017.  Solo seeks to develop products that prevent the existence of counterfeit goods in a supply chain.  Solo was founded and initially operated and managed by Defendants.

11.      As a result of their roles with Solo, Defendants owed fiduciary duties to Solo.

12.     Solo is headquartered in and operates out of Denver, Colorado.

13.     While initially headquartered in Massachusetts, Solo started its operations in Denver, Colorado in early 2020.

14.     Both Defendants conducted operations on behalf of Solo in Denver, Colorado, in 2020.

15.     Defendants created and operated other businesses while serving as directors and officers for Solo.

16.     Because of the roles played by Defendants in these other entities, Defendants logically owed these other entities fiduciary duties.

17.     Defendants then entered into contractual relationships between their various entities, which includes Solo, without any disclaimer or notice of potential conflicts of interest with regard to their competing roles with competing companies.

18.     As Solo fiduciaries, Defendants failed to act in Solo's best interest while they controlled Solo.  This includes, but is not limited to, Defendants' execution of self-dealing transactions without proper approval under Delaware Corporate Law.

### Defendants' Conflict of Interest

19.     At its founding, Defendants operated and managed Solo with a tight group of business partners.

20.     These business partners routinely created companies that failed to generate any meaningful sales or profits.

21.     Defendants were two of the primary directors and officers of Solo prior to 2020 and in the beginning of 2020.

3

22.     Defendants, arguably on behalf of Solo, entered into business transactions with entities also owned by Defendants, to the detriment of Solo.

23.     These transactions personally benefitted Defendants at the expense of their companies, including Solo.

24.     One such company was TechMagic USA LLC ("TechMagic").

25.     Defendants each owned an interest in TechMagic at all relevant times.  Specifically, Defendants owned a controlling interest in TechMagic at all relevant times.

26.     Defendant Shah and Defendant Pedersen were also the Managers of TechMagic at all relevant times. More specifically, Defendant Shah was the "Manager" of TechMagic as registered with the Commonwealth of Massachusetts' Corporations Division.  Defendant Pedersen was the "Managing Director" of TechMagic.

27.     Defendants both owed fiduciary duties to TechMagic and to Solo at the same time.

28.     On February 5, 2018, Solo (f/k/a/ CED Life Sciences, Inc.) entered into a Master Services Agreement with TechMagic (the "MSA").

29.     The MSA was signed  by Defendant Pedersen on behalf of TechMagic, and Lokesh Chugh on behalf of Solo.

30.     At the time Defendant Pedersen executed the MSA on behalf of TechMagic, Defendant Pedersen was also a director and officer of Solo.

31.     At the time Defendant Pedersen executed the MSA on behalf of TechMagic, Defendant Pedersen failed to properly disclose his relationship with TechMagic to Solo.

32.     On the same date, the parties executed a Statement of Work ("SOW") pursuant to the terms of the MSA.

33.     The SOW was also signed by Defendant Pedersen on behalf of TechMagic, and Lokesh Chugh on behalf of Solo.

34.     At the time Defendant Pedersen executed the SOW on behalf of TechMagic, he was also a director and officer of Solo.

35.     At the time Defendant Pedersen executed the SOW on behalf of TechMagic, Defendant Pedersen failed to properly disclose his relationship with TechMagic to Solo.

36.     In an email from Defendant Shah to various executives of Solo's parent company on October 7, 2020, Defendant Shah stated that the work allegedly performed by TechMagic was authorized "by me during my time as CEO and president [of Solo]."

37.     The MSA provides that TechMagic would only deliver services to Solo pursuant to a SOW, which was required to reference the MSA and be executed by both parties.

38.     Only one SOW was executed between the parties.

39.     The only executed SOW was for an "iOS prototype" and "an Android App and web-based management interfaces." The SOW provided an estimated completion time of "2 months" for the iOS prototype. TechMagic was to provide between two and five employees during the duration of the SOW.

40.     Defendants were principals and fiduciaries of both TechMagic and Solo at the time of these transactions.

41.     With their wrongful insider information, Defendants sought to take advantage of Solo's affiliated entities, when they sent improper invoices to Solo.

42.     TechMagic started to invoice Solo after the conclusion of the only SOW. TechMagic also requested payments from its parent company for hundreds of thousands of dollars for work that

neither Solo nor its parent company requested and had no knowledge of.

43.     These invoices were sent to Solo at its Denver, Colorado address.

44.     Defendants, who also controlled TechMagic, sought to receive payment from Solo's parent company, even though Solo was the only other party to the MSA and the SOW.

45.     Solo's parent company is not a party to the MSA or the SOW.

46.     In addition, in March of 2020, TechMagic invoiced Solo for hundreds of thousands of dollars for work performed for the benefit of one of Solo's affiliated entities.

47.     These invoices were sent by Defendants to Solo's affiliated entity at its Denver, Colorado address.

48.     None of Solo's affiliated entities are a party to the MSA or SOW.

49.     One of these affiliated entities is a separate subsidiary of Solo's parent company with no direct ownership connections with Solo. This affiliated entity had no contractual relationship with TechMagic.

50.     TechMagic, under the control of Defendants, continued to invoice Solo for work arguably done on Solo's affiliated entity's behalf until October of 2020.

51.     During this time period, neither Solo's affiliated entity nor Solo's parent company requested work from TechMagic.

52.     TechMagic, at the direction of Defendants, invoiced Solo for well over half a million dollars without an operative SOW, nor any type of agreement to perform these services.  The MSA does not contain language that could possibly apply to services performed for an unrelated third party like an affiliated entity of Solo.

53.     Even if the language of the MSA would allow for such billing, the existing SOW

between TechMagic and Solo did not set forth the scope, standards, and/or specifications for the services reflected in the invoices and does not set forth any timeline for the delivery of the purported services and/or any benchmarks for the progress of the purported projects that the services are in furtherance of or any deliverables to Solo under such purported projects.

54.     Specifically, the 2018 SOW relates exclusively to a previous project requested by Solo in 2018.   Thus, the 2018 SOW could not possibly apply to the services that TechMagic purportedly provided for Solo's affiliated entity.

55.     Despite repeated requests by Solo's parent company and Solo, Defendants and TechMagic, under the control of Defendants, have unequivocally refused to produce a SOW that evidences an agreement to provide services beyond the 2018 SOW.

56.     Despite requests by Solo's parent company and Solo, Defendants and TechMagic have refused to produce a SOW that evidences the work provided for in the TechMagic invoices.

57.     These invoices were not made pursuant to a duly authorized and executed SOW as defined in the MSA.

58.     Importantly, Defendants sought payment on each of the TechMagic invoices to Defendant Shah's home address.

59.     Once these improper invoices were brought to Solo and its parent company's attention, Plaintiff responded on numerous occasions and made reasonable requests for further information.

60.     Plaintiff simply requested for TechMagic to substantiate their invoices and clarify the nature of the services purported to be provided by TechMagic under the MSA.  Defendants, who control TechMagic, failed to produce such evidence.

61.     Furthermore, the deliverables produced by TechMagic pursuant to the purported instructions of Solo fall woefully short of any reasonable industry standards or specifications, lack any useful content, and are generally void of any value.

62.     On October 7, 2020, Defendant Shah stated that the quality of TechMagic's work was wholly immaterial: "[I]t is not a question of 'value' as the MSA is simply for time spent on projects as directed by [Solo]."

63.     Solo did not have any control over Solo's parent company or Solo's affiliated entities. Solo was completely unrelated to each of these companies at the time the MSA and SOW were executed.  Solo then became a subsidiary of its parent company, but had no authority or ability to control its parent company.  Solo also does not have any authority or ability to control any affiliated entity in any manner.

64.     Thus, even if Solo did request work to be done on an affiliated entity or its parent company's behalf, such a request would be improper, because Solo could not act as an agent for either its affiliated entities or parent company.

65.     TechMagic could not possibly believe that Solo could act as an agent for its parent company or its affiliated entity because the Managers of TechMagic, and signatories to the MSA, were also directors and/or officers of Solo.  Thus, the Managers of TechMagic were fully aware that Solo did not have authority to request services on behalf of Solo's parent company or Solo's affiliated entities.

66.     Defendants' intentions are abundantly clear – they seek to wrongfully extract funds from Solo, and its related entities, without the provision of any value in return.  Defendants removed any modicum of doubt as to their intentions when they demanded payment on the improper invoices

from Solo's parent company and Solo's affiliated entity, not the counterparty to the MSA, and demanded payment to TechMagic and Defendant Shah's home address.

## Defendants' Failure to Cure the Conflict of Interest

67.     Defendants owned a financial interest and were managers in TechMagic at all relevant times, specifically on February 5, 2018.  While in possession of their financial and fiduciary interests in TechMagic, Defendants acted in their capacity as directors and/or officers of Solo to enter into the MSA with TechMagic.

68.     While in possession of their financial and fiduciary interests in TechMagic, Defendants acted in their capacity as directors and/or officers of Solo to enter into the SOW with TechMagic.

69.     At all relevant times, Defendants failed to abide by the corporate standards that govern conflict of interest transactions.

70.     Defendants did not keep any minutes or resolutions of Solo's Board of Directors or shareholders from any period of time when the MSA or SOW was authorized and executed through to the acquisition of Solo by its parent company.

71.     Furthermore, Defendants did not disclose the material facts to Solo's disinterested directors and shareholders with regard to Defendants' financial and fiduciary interests in TechMagic.

72.     Under Defendants' leadership, Solo's directors did not approve Defendants' self-dealing MSA or the SOW with TechMagic through a vote by the majority of disinterested directors.

73.     Under Defendants' leadership, Solo's shareholders did not engage in a good faith vote to approve the MSA or SOW transaction.

74.     This undisclosed and wrongful MSA is patently unfair to Solo because TechMagic

sought to exploit the MSA and SOW to bill Solo unlimited amounts without delivering work and/or evidence of any work actually delivered, and without providing deliverables that meet any industry standards.

75.     The terms of the MSA and SOW are extraordinarily unfavorable to Solo, but are favorable to Defendants.

76.     This fundamental unfairness became self-evident during the pendency of the MSA. Defendants' actions in their director and fiduciary capacities at Solo were to the detriment of Solo's interests.

77.     Specifically, the MSA was implemented with no authorized SOW produced for the relevant projects and requests allegedly completed by TechMagic.

78.     The MSA did not have any meaningful scope, standards, or specifications for services and deliverables as set forth in an authorized SOW or any known formal work request communications.

79.     The MSA also had no meaningful deadlines for the delivery of services and the final products to be delivered.

80.     There was no independent, meaningful oversight by Solo of the services rendered under the MSA and no oversight as to whether the deliverables actually met the scope and specifications in an authorized SOW or any reasonable industry standards.

81.     Without any proper disclosure, Defendants controlled both sides of the TechMagic and Solo MSA.

82.     These deficiencies are particularly troubling given that Defendant Shah, who was acting as the President of Solo at the time, was the sole person authorized to make financial and legal

determinations for TechMagic under the MSA, and also was a fiduciary for, and had a personal financial and fiduciary interest in, TechMagic.

83.    At the time Defendant Shah was authorized to make these important contractual decisions on behalf of Solo, he was also an officer and director for TechMagic and owed a fiduciary duty to TechMagic.

84.    Additionally, there was no transparency with the Solo Board of Directors and shareholders with regard to the ongoing conflicts of interest of Defendants related to the services provided by TechMagic and its operations.

85.    There was also a complete lack of adequate documentation related to actions taken under the MSA.

86.    The aforementioned operation of the MSA by Solo to the benefit of TechMagic and its principals evidences the improper nature of the relationship and the subsequent invoices.

87.    Defendants' request for payment on the MSA indicated payment on the outstanding invoices could be made to TechMagic at their own personal home addresses.

88.    Defendants have engaged in unauthorized self-dealing at the expense of Solo and its shareholders, thereby breaching their fiduciary duties of care and loyalty to Solo.

**DEFENDANTS USED TECHMAGIC AS THEIR ALTER EGO**

89.    Defendant Pedersen and Defendant Shah used TechMagic as their "alter ego."

90.    Defendant Shah and Defendant Pedersen failed to keep their corporate and individual funds separate.  Specifically, Defendants repeatedly requested payment on TechMagic's invoices to Defendant Shah's home address.

91.    Defendant Shah and Defendant Pedersen used TechMagic as their personal piggy

bank, as evidenced by their request for payment to Defendants' home addresses.

92.    Defendants failed to follow corporate formalities.  Specifically, Defendants did not hold board of directors and shareholders meetings.  Defendants further failed to maintain adequate minutes of any corporate meetings.  Defendants failed to keep corporate records.

93.    Defendants failed to properly disclose conflicts of interest.

94.    At all relevant times, Defendant Shah and Defendant Pedersen owned a controlling interest in TechMagic.

95.    At all relevant times, Defendants were managers of TechMagic.

96.    TechMagic was created by Defendant Shah and Pedersen, and shares the same address as Defendant Shah's home.

97.    Defendant Shah and Defendant Pedersen exerted complete control over TechMagic's finances, policies, and business practices at all relevant times.

98.    Defendant Shah and Defendant Pedersen controlled the means and methods of how TechMagic conducted any business related to Solo, the MSA, and the SOW.

99.    Defendants' control over TechMagic was used to allow Defendants to personally profit from conflict of interest transactions, including the MSA and SOW.

## DEFENDANTS' INTENTIONAL INTERFERENCE

100.    Defendant Shah entered into contracts on behalf of Solo.

101.    In November of 2019, Defendant Shah became an officer of Solo's parent company, serving as its Chief Technology Officer.

102.    In August of 2020, Defendant Shah was furloughed.

103.    While not actively employed by Solo or Solo's parent company and without

authorization from Solo or Solo's parent company, Defendant Shah contacted Solo customers.

104.    Defendant Shah induced Solo customers to sever their ties with Solo.

105.    Without authorization and actual authority from Solo, Defendant Shah repeatedly contacted Plaintiff's customers, including LatCode S.A.S., the State of Utah, Legion of Bloom, and Zion Alchemy (collectively the "Customers") to undermine the Customers' confidence in the very product that Defendant Shah created and sold on behalf of Solo.

106.    Defendant Shah intended for these communications to lead to the termination of the Customers' agreements with Solo and/or to negatively impact Solo.

107.    These communications contained material lies and misstatements that were intentionally aimed at interfering with Plaintiff's contractual relationships.

108.    These communications were improper because they violated the professional standards of honesty, good faith and fair dealing, among others.

109.    According to a text from Defendant Shah, Defendant Pedersen "notif[ied] both the State of Utah and the debt holders" of TechMagic's unpaid invoices despite the fact that both Defendants knew that TechMagic could not perform work for Solo's parent company and Solo's affiliated entity under the MSA and SOW.

110.    Defendant Pedersen's actions were exclusively intended to negatively impact the relationship with the State of Utah and other third parties who received these communications.

111.    The purpose of  these communications was to apply pressure on Solo to pay the improper invoices.

112.    Defendant Pedersen's communications with the State of Utah and the debt holders was an intentional and improper interference because Defendant Pedersen knew that the

TechMagic's unpaid invoices were invalid, and sought to exert pressure upon Solo to pay for services that were neither performed, nor requested.

113.    Defendant Pedersen's communications therefore intended to extract payment from Solo for alleged work that Defendant Pedersen knew was improper.

114.    These communications were further improper because they were in violation of professional standards.  A wrongful representation of improper invoices that Defendant Pedersen knew were not valid is in stark contradiction to the professional standards of honest and good faith communications.

115.    In fact, officers of Solo routinely received calls from customer representatives who took issue with statements made by Defendant Shah while Defendant Shah was not permitted or authorized to speak with Solo's customers.

116.    Solo's officers found these developments incredibly troubling, particularly given Defendant Shah's apparent intent to sabotage Plaintiff.

117.    This interference directly led to the termination of or interference with contracts with Plaintiff, specifically including the LatCode S.A.S., State of Utah, Legion of Bloom, and Zion Alchemy contracts.

118.    Plaintiff has also learned that Defendant Shah readily agreed to unconscionably disadvantageous terms on behalf of Plaintiff.

119.    When Plaintiff's customers sought to sever ties with Plaintiff as a direct result of Defendant Shah's actions, Plaintiff was shocked at the contractual rights that Defendant Shah had agreed to, without authorization and approval by Solo.

120.    These terms severely harmed Plaintiff and were contrary to Plaintiff's business

practices and the authority provided to Defendant Shah by Plaintiff.

121.     Defendant Shah proceeded to actively harm Plaintiff's relationships with customers by falsely representing that his very own creation was worthless and useless.

### COUNT I – BREACH OF FIDUCIARY DUTY – CONFLICT OF INTEREST
### (Delaware General Corporate Law § 144)

122.     Plaintiff hereby incorporates the preceding paragraphs 1 – 121 as though fully alleged herein.

123.     At all relevant times, Defendant Shah and Defendant Pedersen served as officers and directors of Solo.

124.     As officers and directors of Solo, Defendants owed Solo a duty to deal with utmost good faith and solely for the benefit of Solo.

125.     Defendants had a significant financial interest in TechMagic.  Specifically, Defendants "beneficially own a controlling interest in TechMagic."

126.     Defendants were Managers of TechMagic at all relevant times.

127.     Defendants' controlling financial and fiduciary interest in TechMagic, along with Defendants' status as Managers of TechMagic, created a conflict of interest when combined with Defendants' status as directors and/or officers and beneficial owners of Solo.  These facts created a conflict of interest under 8 Del. Code Ann. § 144 (2021).

128.     Defendants failed to fully disclose their financial interest in TechMagic.  Defendants also failed to disclose the fact that Defendants were both Managers of TechMagic.

129.     Defendants were required to fully disclose all material facts as to Defendants' relationship or interest in TechMagic before they entered into a contract on behalf of Solo with TechMagic. *See* 8 Del. C. § 144 (2021).

130.    Defendants failed to fully disclose the material facts related to the MSA and Defendants' relationship and interest in TechMagic. *See* 8 Del. C. § 144(a)(1-2) (2021).

131.    Furthermore, Defendants failed to hold any vote among Solo's disinterested directors or shareholders to cleanse Defendants' conflict of interest in the TechMagic transaction. *See* 8 Del. C. § 144(a)(1-2) (2021).

132.    The contract entered into between Solo and TechMagic did not provide any limits on the amount of money that TechMagic could bill Solo, and failed to provide any dates, standards, or limitations on deliverables. This rendered the MSA fundamentally unfair to Solo. *See* 8 Del. C. § 144(a)(3) (2021).

133.    TechMagic, at the direction of Defendants, proceeded to bill Solo for hundreds of thousands of dollars. TechMagic failed to deliver a functional product in return.

134.    As a direct and proximate cause of Defendants' misconduct, Plaintiff was damaged in an amount to be proved at trial, well in excess of $500,000.

## COUNT II – BREACH OF FIDUCIARY DUTY
### (Delaware Common Law)

135.    Plaintiff hereby incorporates the preceding paragraphs as though fully alleged herein.

136.    Defendants owed Plaintiff a duty of loyalty as a result of Defendants' status as officers and directors of Solo. Defendants also owed Plaintiff a duty of loyalty because Defendants possessed a controlling financial and fiduciary interest in Solo.

137.    Defendants executed the MSA with terms extraordinarily favorable to TechMagic while holding an undisclosed financial interest in TechMagic. Specifically, Defendants "beneficially own a controlling interest in TechMagic."

138.    Simultaneously, Defendants were the Managers of TechMagic, and were so at all

relevant times.

139.   Defendants breached their duty of loyalty when they allowed Solo to execute a grossly unfavorable contract with TechMagic.

140.   Defendants breached their duty of loyalty when they allowed TechMagic to invoice Plaintiff for services not rendered and/or that did not meet any level of commercial standards.

141.   Defendants breached their duty of loyalty when they invoiced Solo for services allegedly performed on behalf of Solo's parent company and Solo's affiliated entities when Defendants knew these services were outside of the scope of the MSA and SOW.

142.   Defendants breached their duty of loyalty by furthering their self-interests by causing customers to sever their relationships with Solo.

143.   Disinterested Solo officers and shareholders were not apprised of Defendants' conflicts of interest.

144.   Disinterested Solo officers and shareholders had no reason to know of Defendants' breach of their duties of loyalty.

145.   As a direct and proximate result of Defendants' misconduct, Solo has been damaged by an amount to be proven at trial.

### COUNT III – BREACH OF THE DUTY OF CARE – FRAUD, CONFLICT OF INTEREST, BAD FAITH, AND SELF-DEALING
### (Delaware Common Law)

146.   Plaintiff hereby incorporates the preceding paragraphs as though fully alleged herein.

147.   Defendants owed Plaintiff a fiduciary duty of care because Defendants were officers and directors of Solo.

148.   Defendants breached that duty of care by fraudulently invoicing Solo through

TechMagic.

149.    Defendant Shah and Defendant Pedersen made material misrepresentations in TechMagic's invoices dated April 21, 2020, May 26, 2020, June 23, 2020, July 7, 2020, October 7, 2020, September 1, 2020, October 2, 2020, and November 6, 2020.    These material misrepresentations were as follows:

    (a)  TechMagic was authorized to bill for the work contained in these invoices pursuant to the MSA and SOW;

    (b)  TechMagic actually completed the work identified in the invoices; and

    (c)  Solo had corporate authority to request the stated projects.

150.    The invoices were transmitted to Solo at Solo's Colorado address.

151.    Payment was to be remitted to 12 Heath Hill, Brookline Massachusetts 02445, which is Defendant Shah's home.

152.    Defendants knew that the statements made in the invoices, specifically those identified above were untrue.

153.    Defendants intended for Solo to rely on those statements and to remit payment to TechMagic as a direct and proximate result of these statements.

154.    Defendants further breached their duty of care when they entered into the self-dealing transaction with TechMagic.

155.    Defendants also breached their duty of care when they acted in bad faith and invoiced Solo for services provided for an unrelated third party that was not a party to the MSA.

156.    Defendants breached their duty of care when they entered into a conflict of interest transaction between Solo and TechMagic.

157.    Defendants breached their duty of care by entering into an unconscionable agreement with Solo.  Defendants knew that the MSA was grossly unfavorable to Solo, yet continued to provide worthless services to Plaintiff at exorbitant prices, all to the benefit of Defendants.

158.    Defendants knew there was not an applicable SOW for TechMagic to provide these services to Plaintiff, and did not seek the necessary contractual approval from Plaintiff to provide such work.

159.    As a direct and proximate result of Defendants' misconduct, Solo has been damaged by an amount to be proved at trial.

### COUNT IV – INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Colorado Common Law)

160.    Plaintiff hereby incorporates the preceding paragraphs as though fully alleged herein.

161.    Defendant Shah caused Solo to enter into various customer agreements.

162.    Defendant Shah exceeded his authority to enter into these various agreements under the terms he executed.

163.    Defendant Shah knew that Solo entered into an agreement with LatCode S.A.S. the State of Utah, Legion of Bloom, and Zion Alchemy in particular, among other agreements with other customers.

164.    Defendant Shah, with this knowledge, intentionally and improperly interfered with Solo's contractual relations and impaired Solo's ability to pursue its business interests as described more fully herein.

165.    Defendant Shah's misconduct was willful and wanton.

166.    Defendant Shah's misconduct was not authorized or approved by Solo and was done without Solo's consent or authorization

167.    As a direct and proximate result of Defendants Shah's wrongful acts as described herein, Plaintiff has suffered damages and have incurred attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Solo respectfully requests a jury on all issues so triable, and further requests as follows:

1.    The Court assume jurisdiction.

2.    The Court award Plaintiff monetary damages including, but not limited to, actual and consequential damages, economic damages, and punitive damages and any other such relief to the maximum extent permitted by law.

3.    The Court award Plaintiff its reasonable attorneys' fees and costs to the maximum extent permitted by law.

4.    The Court award Plaintiff pre- and post- judgment interest to the maximum extent permitted by law.

5.    The Court award additional or alternative relief that may be just, proper, appropriate, and equitable under the circumstances.

Dated:  May 21, 2021.                    Respectfully Submitted,

By:    *s/ Jon J. Olafson*
_____
Jon J. Olafson (#43504)
Thomas L. Dyer (#53883)
LEWIS BRISBOIS BISGAARD & SMITH LLP
1700 Lincoln Street, Suite 4000
Denver, Colorado 80203
Phone: (303) 861-7760
Fax: (303) 861-7767
Email: Jon.Olafson@lewisbrisbois.com
Email: Thomas.Dyer@lewisbrisbois.com
*Attorneys for Plaintiff*